**DOWELL, Inc. v. JOWERS et al.**

No. 12838.

United States Court of Appeals
Fifth Circuit.

May 5, 1950.

Rehearing Denied June 15, 1950.

See also 5 Cir., 166 F.2d 214, 2 A.L.R.2d 442.

Val Irion, Shreveport, La., Malcolm E. Lafargue, Shreveport, La., for appellant.

Harry V. Booth, Shreveport, La., John A. Dixon, Jr., Shreveport, La., J. Roy Caskey, Arcadia, La., for appellees.

Before McCORD and BORAH, Circuit Judges, and WRIGHT, District Judge.

BORAH, Circuit Judge.

This is the second appeal in an action brought by the widow and three minor children of Frank Jowers, who was employed by the Penrod Drilling Company as a driller and who was killed on October 29, 1945, by an explosion which occurred during the bringing in of a gas well. On the day aforementioned, the Penrod Drilling Company had completed drilling of the well and was getting it in readiness for defendant-appellant, Dowell Incorporated, whom it had hired to acidize the well. Frank Jowers of Penrod Drilling Company was in charge of the afternoon shift and when he came on duty the "Christmas tree" had already been bolted to the casing and the well was being washed out. The Jowers crew continued to prepare the well for acidizing, made the necessary connections on the "Christmas tree", tightened down on all bolts, connected the flow line to the right casing wing valve, inserting a choke therein in the choker nipple between the tee and the union, and then helped Dowell's crew connect up their equipment. Thereupon the Dowell crew began to acidize the well, and when this operation had been completed, Jowers and his crew proceeded to bring in the well, and the well exploded, killing Jowers.

The complaint alleges that during the acidizing process a choke was negligently removed from the flow line by some member or members of the Dowell crew without informing Jowers of the fact that they had removed the choke and safety device that was placed there for the purpose of controlling the well and that this negligence was the proximate cause of Frank Jowers being killed. In addition the complaint alleges that Dowell was further negligent in that during the acidizing process one of its agents ordered the tubing valve closed without first checking to see whether or not there was a choke in the flow line and without advising or consulting with Penrod's superintendent of operations. Further, that the closing of the tubing valve into and through which acid was pumped, caused the gas to flow through the casing flow line with such tremendous force as to break it, thereby precipitating the accident which resulted in Jower's death. The case came on for trial on these issues and the jury awarded a verdict for the plaintiffs in the sum of $108,999.99 which, upon remittitur, was reduced to $83,999.99.

Appellant appeals from the judgment entered upon the verdict and from an order denying its motion for judgment *non obstante veredicto,* assigning sixteen specifications of error which for convenience, we shall reduce and consolidate to six. Appellant contends that the trial judge erred: (1) in failing to grant its motion for a directed verdict or its motion for judgment *non obstante veredicto,* or in the alternative its motion for a new trial; (2)

in making certain remarks in the presence of the jury; (3) in not granting a mistrial when a lawyer for appellee collapsed during his summation to the jury; (4) in submitting to the jury the tubing valve closing issue and in refusing to instruct the jury that the plaintiffs had abandoned that portion of their pleadings; (5) in charging the jury on the subject of damages; (6) in permitting the appellees to call on cross-examination the witness Wenk, a former employee of Dowell Incorporated.

The first question requires an examination of the record to determine whether or not the evidence adduced was sufficient to present a jury question. There was evidence to establish these facts: That immediately prior to or during the early stages of the acidizing process members of the Penrod crew placed a choke in the flow line leading to the slush pit. This flow line was connected to the right casing wing valve. The choke in question had a 2 inch aperture at the upstream end and was reduced in size to ½ inch at the other end. Its placement in the flow line constricted the flow of fluid or gas through it under pressure and thereby reduced the pressure downstream from the choke. The function of a choke is not only to restrict and control pressure but it is also a safety device used in keeping high-pressure gas wells under control. After the accident the choke was found in the cellar behind the "Christmas tree" and the indirect evidence to the effect that it had been removed from the flow line and could not have been dislodged by the explosion is supported by the fact that it was found upon inspection that the threads on the choke were not stripped or damaged. Every person present during the acidizing of the well denied removing the choke, but there is evidence to show that the choke was removed and at least four witnesses were of the opinion that had the choke not been removed the accident would not have occurred.

There remains for consideration the sufficiency of evidence which tends to show that Dowell removed the choke in order to acidize the well. Without describing in detail the technical acidizing process it is sufficient for present purposes to say that there are two stages in this operational technique: spotting the acid, and placement of the acid in the formation to be treated. In the first step of the operation and after the well had first been filled with water, the Dowell crew connected a line running from one of their pump trucks to the right tubing wing valve and through this connection pumped 5,000 gallons of hydrochloric acid into the tubing of the well. Following the injection of the acid, the Dowell crew then pumped water through this connection, thus creating a pressure down the tubing and forcing acid up the annulus between the tubing and the casing to the producing zone to be treated. In this the first stage of the operation there is need for the choke being in the flow line to prevent the column from being cut by air or gas. After spotting the acid, the next step is to propel it through the gun-perforated casing into the limestone formation to be treated. To force the acid into this formation it was necessary to create in the casing a downward pressure. This pressure was caused by pumping water into the casing, and the connection through which it was pumped necessarily had to be made through either the left or the right casing wing valve. The evidence shows that had this connection been made into the flow line and thence through the right casing wing valve it would have been necessary in this second stage to have removed the choke in order to maintain proper pressure, otherwise the acid would have been displaced upwards in the annulus of the casing and away from the formation sought to be treated. This is so because had the Dowell crew pumped water into the casing through the flow line with the choke in position they would have had sixteen times as much pressure on and through the flow line as they had on and through the casing, due to the fact that the choke reduced the size of the flow line from 2 inches to ½ inch as compared to the tubing which was 2 inches in diameter.

Chastain, derrick man on the Penrod crew and a witness for the plaintiffs, testified that some unidentified person other than a member of the Penrod crew spoke

to him concerning the flow line which was connected to the right casing wing valve and as a result of that conversation they disconnected the flow line at the union located downstream from the choke and another two inch line was connected up to operate through the right casing wing valve; which line ran in the direction of Dowell's truck. The inference being that this was the connection made by Dowell in order to pump water into the casing under pressure. Chastain also testified that there was no connection on the left casing wing valve and that Penrod did not have sufficient equipment to make connections on both the left and right casing wing valves.

■■■ J. H. Poole, who was employed by Penrod as a swisher, testified that there was no connection whatsoever on the left casing wing valve during the acidizing operation but that there was a connection on the flow line on the right casing wing valve; that the union was disconnected on the flow line after the water had been displaced from the well, and that this union was used by Dowell to connect the line running from the flow line to the water pump and that water was pumped into the casing through this union. He further corroborated Chastain by stating that the bull plug and gauge on the left casing wing valve had never been removed on the day in question. Nettles, a member of the Penrod crew, also testified that the connection into the casing was made through the flow line and that the only device connected to the left casing wing valve was a gauge. There is also evidence in the record to the effect that readings were taken off of this gauge when, after the placement of the acid, the pressure rapidly began to rise. In the light of the foregoing, we cannot on this record say that the proof of negligence was not sufficient to present a jury question. In our opinion the trial judge properly submitted the issues to the jury; and the jury chose to believe appellees' witnesses. This court is not free to reweigh the evidence and set aside the jury's verdict merely because the jury could have drawn different inferences or conclusions or because the court regards another result as more reasonable. That which has just been said also disposes of appellant's specification in respect to contributory negligence.

■■■ The second question is addressed to certain remarks by the court which, it is contended, were prejudicial. But no objection was taken to the remarks complained of. Counsel now say that to have made objection would have further displeased the trial judge and would have caused the court to make further and possibly more damaging statements to the jury, but we cannot accept the excuse. We have examined the remarks complained of and cannot from the gaps in the chronological narrative say that they had the prejudicial strength attributed to them. At any rate, it was the duty of counsel to object to them and failing in this we have no occasion to consider the meaning of the remarks made or the materiality of the error, if any, in making them.

■■■ Coming now to a consideration of the third question we find that appellees' chief counsel became ill and at 10:25 collapsed during his summation to the jury. Whereupon counsel for the appellant, outside of the presence of the jury, moved for a recess until 1:00 p. m. and upon the denial of this motion counsel thereupon moved for a mistrial. The record shows that the trial judge immediately recessed the jury after this unfortunate occurrence and that after a recess of one-half hour the trial was again resumed. When the trial was resumed the trial judge thoroughly instructed the jury that it should not be inflenced in any way "and particularly not against the defendant company." The unusual situation was adequately handled and we cannot on this record say that the trial judge abused his discretion.

■■■ The fourth question presented is based on the contention that the trial court erred in refusing to grant the requested charge that plaintiffs had abandoned that portion of their amended pleadings which alleged as a cause of the accident the closing of the tubing valve by or on orders of the Dowell crew, and in submitting this issue to the jury. We agree with the trial

judge that there was no final abandonment of this allegation. There is evidence in the record to show that the closing of the tubing valve would create a higher pressure on the casing and a consequent higher pressure on the flow line attached thereto, and that the valve was closed on orders from a member of the Dowell crew. The court properly charged the jury that if the Dowell crew exercised due care in regard to the work and did nothing in a careless manner they must find for the defendant and, further, that if the jury found it was common usage for the acidizing crew to close the tubing valve then they could not find Dowell was negligent in this particular, unless it was done in such a manner as to prevent Jowers from finding out that the valve had been closed.

The fifth question is based upon the contention that the trial judge suggested to the jury that they bring in a verdict for $108,999.99. That portion of the charge complained of reads as follows: "There are two verdicts that you may bring in this case. I have them here on two separate sheets of paper and it will be given to you by the Bailiff. No. 1 is, "We the jury find for the defendant." No. 2 is, "We the jury find for the plaintiff, Mrs. Frank Jowers, individually and against Dowell, Incorporated in the full sum of $ ......." You may remember that that cannot and must not exceed $109,-000.00.[1] I will write it in the corner in pencil. Your award, in case you decide in favor of the plaintiff, can be for any amount, $1.00, $10.00, or up to $109,000.-00, and no more. * * * 'And we find for the plaintiff, Mrs. Frank Jowers, as tutrix of the minor, Helen Marie Jowers and against Defendant, Dowell, Incorporated in the full sum of $ ......' In the righthand corner you have 'Helen Marie'.

The maximum you can give that girl is $24,000. She is the oldest and has the least number of years to be 21. Then, you have 'Barbara Jean Jowers', and that can be any amount but must not exceed $36,-000.00; 'and we find for the plaintiff, Mrs. Frank Jowers, as tutrix of the minor, Bonnie Lee Jowers, and against defendant, Dowell, Incorporated, in the full sum of $ ......,' and that may not exceed $48,-000."

The pleadings show that Mrs. Jowers, individually and as tutrix of the three minor daughters of Frank Jowers, claimed damages in the total sum of $218,435.80. It was not error for the trial judge to instruct the jury that it could not award damages in excess of the amounts claimed in the pleadings;[2] and though more apt language could have been employed to impress the jury that the amounts claimed in the complaint should not be taken as a criterion to act upon, but only as a limit, beyond which the jury could not go, the court did tell the jury that their award if in favor of the plaintiffs could not exceed the sums claimed and could be for any amount, including the nominal sum of $1. We agree with appellants that the trial judge may not in his charge to the jury refer to a sum suggestive of a proper award. But we do not agree that the charge considered as a whole is susceptible of that construction.

No error of law appearing upon the record, this court cannot reverse the judgment because we may be of the opinion that the jury should have returned a verdict for a less amount.[3] Whether the trial court's action in overruling the motion for a new trial was erroneous or not our power is restricted to the determination of questions of law arising upon the record.[4] The trial court did not err in refusing to instruct the jury as to amounts that have

1. Apparently the trial judge was under the impression that Mrs. Jowers sued for $109,000. As an individual she sued for $110,435.80.

2. Chesapeake & Ohio R. Co. v. Carnahan, 241 U.S. 241, 36 S.Ct. 594, 60 L.Ed. 979; McDermott v. Severe, 202 U.S. 600, 26 S.Ct. 709, 50 L.Ed. 1162.

3. Reid v. Nelson, 5 Cir., 154 F.2d 725; Home Insurance Co. of New York v. Tydal Co., 5 Cir., 157 F.2d 851.

4. Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 481, 53 S.Ct. 252, 77 L.Ed. 439; New York Central & H. Railroad Co. v. Fraloff, 100 U.S. 24, 31, 25 L.Ed. 531.

been awarded by the courts of Louisiana in similar actions.[5]

The final question presented by this appeal is whether or not the trial judge erred in permitting the plaintiff to call Herbert Wenk on cross-examination. Wenk, one of five engineers employed by the Shreveport office of Dowell, Incorporated, was in charge of the acidizing crew, and was not an officer or director of Dowell, nor was he a "managing agent" as that term is used in Rule 43(b), Federal Rules of Civil Procedure, 28 U.S.C.A.[6] It was error to permit plaintiff to call Wenk on cross-examination but this error was harmless and did not affect the substantial rights of the parties.

We have considered each and every error assigned and find no reversible error in the record, and the judgment is accordingly.

Affirmed.

5. Dowell, Incorporated v. Jowers, 5 Cir., 166 F.2d 214, 2 A.L.R.2d 442.
6. Cf. Peterson Construction Co. v. Lafayette County, Wisconsin, 2 Fed. Rules Serv. 43b.2, Case No. 1; 3 Moore's Fed. Practice, 1948, Cumulative Supplement, § 43.03. Cf. 2 Moore Federal Practice § 26.18, p. 2490.